# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4475 | **DATE** | 6/29/2000 |
| **CASE TITLE** | Coniglio vs. City of Berwyn, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants; Motions to Strike

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. The Court denies defendants' motions to strike [47-1], [52-1], [53-1] as it makes these considerations when evaluating the parties' Rule 12 statements of facts.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | JUL 12 2000 date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| SLB | courtroom deputy's initials | date mailed notice |

Document Number

Date/time received in central Clerk's Office      mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN G. CONIGLIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 99 C 4475 |
| | ) | |
| CITY OF BERWYN, ILLINOIS, | ) | Judge George W. Lindberg |
| an Illinois municipal corporation, | ) | |
| J. ALLEN ZANK and THOMAS | ) | |
| SHAUGHNESSY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Susan G. Coniglio, has filed a six-count complaint against the City of Berwyn,

Illinois; Thomas Shaughnessy, mayor of Berwyn; and J. Allen Zank, comptroller of Berwyn.

She alleges that Zank's practice of viewing pornography on the Internet in full view of city

employees created a hostile work environment in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. §2000e *et seq.,* and the Fourteenth Amendment, 42 U.S.C. § 1983; that

Shaugnessy's failure to respond to her complaints about Zank's behavior violated Title VII and

the Fourteenth Amendment; that Zank retaliated against her for complaining in violation of her

Title VII and First Amendment rights; and that Zank's behavior constituted intentional infliction

of emotional distress. Coniglio also claims that the defendants failed to accommodate her

disability, an anxiety disorder, in violation of the Americans with Disabilities Act, 42 U.S.C.

§12101, *et seq.* Defendants have moved for summary judgment on all counts. For the following

reasons, the court grants the motion in part and denies it in part.



I.     Statement of Facts

The following statement of facts is based on the portions of the parties' extensive

statements of material facts that are relevant to the arguments they make and to which the parties

actually refer in their briefs.[1]  The court must read the record in the light most favorable to the

non-moving party. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 394 (7th Cir. 1998).  A

genuine issue for trial exists only when a reasonable jury could find for the party opposing the

motion based on the record as a whole. *Pipitone v. United States*, 180 F.3d 859, 861 (7th

Cir.1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir.1994)).  That

"general standard is applied with added rigor in employment discrimination cases, where intent is

inevitably the central issue." *McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368, 370-71 (7th

Cir.1992). However, "the mere existence of some alleged factual dispute between the parties"

will not defeat a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986).  The court therefore views the evidence in light of nonmovant Coniglio's version of any

disputed facts where that version is arguably supported by the record.

Plaintiff began working as a full-time secretary for Berwyn's legal department in May

1988.  Defendant Zank was comptroller of Berwyn beginning in approximately 1990 and was

plaintiff's immediate supervisor until plaintiff's termination in July 1998.  Defendant

Shaughnessy was the mayor of Berwyn during the relevant period and was Zank's immediate

---

[1] Defendants have moved to strike portions of plaintiff's Rule 12N statement and her
supporting affidavit, claiming that her affidavit contradicts her deposition testimony and is based
on impermissible hearsay.  The court finds that the information in the affidavit does not clearly
contradict plaintiff's deposition testimony.  Plaintiff's testimony concerning conversations she
had with coworkers, if indeed hearsay, could be replaced at trial by admissible evidence. *See
Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742-43 (7th Cir.1997).

supervisor. In approximately 1990, Zank sought to promote plaintiff from her position as legal secretary to manager of the city computer department. Prior to this appointment, plaintiff's only experience with computers was word processing and data entry. She had no experience operating a mainframe computer although she attended training sessions in the early 1990s and again in the mid-1990s. Plaintiff's responsibility as computer manager was to keep the city's mainframe computer up and running. The mainframe computer held a variety of different data bases, including payroll, budgeting, water department records and police department records.

In October 1993, after plaintiff returned from a maternity leave, Zank provided written confirmation to plaintiff that Shaughnessy had approved a change in her work schedule. Plaintiff was able to use available sick and/or vacation leave to take Mondays off; work at home in the morning on Tuesdays; and work regular hours Wednesdays through Fridays. Plaintiff's day off was later switched to Thursday.

In November 1994, plaintiff took a second maternity leave following the birth of her second child. Just prior to plaintiff's second maternity leave, Berwyn began to introduce personal computers into the workplace. While plaintiff was on maternity leave, the city entered an oral contract with Wayne Buehrer, an independent contractor, to assure coverage of the mainframe computer system while plaintiff was on leave. Buehrer had been the dean of information systems at Triton Community College and had a degree in computer science from the College of Lake County. His initial job duties were to complete an initial survey to determine the levels of computer support that existed in the city and the computer needs of each different department. Buehrer understood the city's intent to introduce personal computers into all of the offices and then to introduce other automated systems. Buehrer was also expected to

teach and train personal computer users, provide support to the users and make their personal

computers operational and functional. Subsequently, Buehrer was expected to develop an

automated system for the collections office, the building department, and the payroll

department. After plaintiff's return from maternity leave, Buehrer remained under contract with

the city, concentrating a large percentage of his time on the city's new personal computer

system. After her return from maternity leave, plaintiff remained responsible for operation of

the mainframe and the users associated with the mainframe system, and Buehrer was to teach

about the personal computers and plaintiff would assist. After plaintiff returned from leave,

Buehrer spent the majority of his time working on the personal computer system.

Beginning sometime in mid-1995, plaintiff observed Zank viewing pictures of completely

naked women on Internet websites. She testified that the women were sometimes pictured in

different sexual positions with creatures resembling medieval gargoyles. At first, plaintiff

observed such pictures "a few times a week." She saw them when she went into Zank's office

and also from the area outside his office because the wall of his office had a picture window.

Plaintiff approximates the distance between the computer monitor on Zank's credenza and the

window in his office across from the computer monitor as 12.5 feet. According to Luna

Iovinneli, another employee, Zank viewed pictures of naked women on his computer "often."

Coniglio and Iovinneli also saw Zank with a photo of a naked girl in his office, printing color

pictures of naked women on glossy paper, and putting the images into binders in his office. Both

testified that they discussed Zank's activities with several other female employees in the office,

including Corinne Falco, Janet Pechota, Mary Messina, Mary Drenth and Annette Bolec. Falco

testified that she saw Zank viewing pictures of topless or naked women once on his computer

and Pechota testified that she saw Zank viewing pictures of topless women approximately three times.

According to plaintiff, she informed Shaugnessy about Zank's activities in a meeting sometime in 1995. He told her he would look into it although he never got back to her. Shaugnessy denies that plaintiff complained of Zank's conduct at this time. Plaintiff also testified that she told Alderman Ron Pechota about Zank's activities. Pechota denies that he ever had a discussion with plaintiff about Zank's activities. Plaintiff never filed a written grievance in accordance with the City of Berwyn Grievance Procedure.

Beginning in 1996 and escalating in 1997 after she complained a second time to Shaugnessy about Zank's behavior, Zank would follow Coniglio around the office and to the washroom, questioning other employees about her whereabouts. Zank stated that he merely looked for plaintiff when the computer system was down and he needed to know what was happening. In October 1997, the city's Aldermen requested a sign-in sheet for certain employees at city hall. Zank required plaintiff to sign in and out on the sign-in sheet although she was not a manager or department head.

In October 1997, Coniglio met with Shaugnessy in his office. She told him that she was tired of Zank's harassing behavior, including being singled out and followed around the office. Plaintiff complained that Zank was requiring her to sign the sign-in sheet, which was supposed to apply only to department heads. Shaugnessy stated that plaintiff also told him that she wanted to report that Zank was looking at pictures of women on his computer. She testified that she stated that she was "tired of the fact that [Zank] was using company time to do all this pornography pulling up from the Internet" and that he was using city funds to purchase glossy paper to print

the pictures out. Plaintiff stated that Shaugnessy's response was "oh no, not another lawsuit, you would not be hurting Allen, you would be hurting me." Shaugnessy stated that he told Coniglio that he would look into it and that he then told her that he "didn't want to talk to her in closed session anymore. That she had mentioned that she was talking to an attorney, taking up legal action, so I told her—I opened the door and [said] I do not talk to you alone any longer." Plaintiff stated that a few days later she ran into Shaugnessy on the stairs and he "pointed his finger at her and told her to shut her goddamn mouth and sign the f--- sheet."

In late October 1997, Coniglio asked to change her schedule and leave work at 4:00 p.m. because of her husband's holiday work schedule. She testified that other employees used flex time and left work early. Zank stated that he denied plaintiff's request based on the city's need for her services during normal business hours when the computers were in full use. When Zank refused the request, Coniglio began taking her lunch hour from 3:30 to 4:30 p.m. to pick up her children, whom she brought back to the office with her. She stated that three or four other employees had brought children or grandchildren to work with them. Coniglio maintains that from 4:00 to 5:00 the office was winding down and Buehrer was usually working by then. Buehrer testified that he usually started work later in the day because the work he did on the computers had to be done when the computers were not in use.

In November 1997, three or four weeks after Coniglio's meeting with Shaugnessy, he met with Zank and Giger to discuss Zank's Internet use. Zank denied using the Internet inappropriately but agreed to remove himself from it if there was any "conjecture or worry." He denies ever viewing pictures of naked women in his office, printing such pictures out or keeping them in binders in his office. On November 25, 1997, Giger sent a memo to Zank in response to

-6-

the meeting and in which he confirmed that only three computers at city hall were connected to the Internet. One was in the training room, one was in the mayor's secretary's office and one was in the building department director's office. Plaintiff stated that from late 1997 until July 1998, she saw Zank viewing pictures of women on his computer screen "very infrequently," more than once but less than six times.

On November 26, 1997, Zank notified plaintiff in a letter that effective immediately, her lunch hour was to be taken at 11:30 a.m. or 12:30 p.m. Also in the letter was notice that effective December 3, 1997, her job status would be changed "back to what it originally was, a full-time employee." The letter stated that the change was necessary because of the complexity and involvement of plaintiff's department with all other departments in city hall. According to Zank, maintaining normal work hours would assure that plaintiff would be on hand when computers were in full use.

Plaintiff maintains that she and Zank had not discussed her return to full-time hours before this memo, that she hadn't needed to be there at the end of the day and that she carried a pager so that she could be reached when she wasn't at the office. Several other employees worked flex time hours or left work early for medical or personal reasons. Zank testified that he had asked plaintiff several times previously about when she was going to return to full-time hours.

After receiving the notice on November 26, 1997, plaintiff was absent from work for the full week following the letter. Calls from plaintiff's father-in-law indicated that she was ill and under a doctor's care. On the third day plaintiff was absent, Zank requested that plaintiff provide a letter outlining the type of illness plaintiff had and her prognosis for recovery.

On December 8, 1997, plaintiff came to work for a full day with a letter from Dr. Nejat Destani stating that the doctor had treated plaintiff on November 26, 1997, for anxiety and stress. The letter contained no limitations for plaintiff's ability to work full-time and provided no description of the symptoms of plaintiff's illness or the prognosis for her recovery.

On December 9, 1997, plaintiff left work at 11:15 a.m. due to sickness. On December 10, 1997, she worked a full day. December 10, 1997, was plaintiff's last full day of work at the City of Berwyn. For the remainder of plaintiff's tenure at the city, she left work for the day between 11:00 a.m. and 2:00 p.m. depending on the day's events and how she was feeling that day. On February 26, 1998, plaintiff delivered a note to the city from Dr. Rosa Abraira that stated: "Susan needs to continue half days till further notice." Plaintiff did not request a change in status to a part-time employee.

During the month of December 1997, plaintiff received approximately 11 e-mails at work from an unknown source. The subject lines of these e-mails had vaguely suggestive topics and one e-mail had more explicit sexual content or pictures. Plaintiff does not know who sent the e-mails to her.

On June 24, 1998, Zank notified plaintiff that the balance of her sick and/or vacation time would be used up on July 3, 1998. The letter further stated:

> Please advise me of what your intentions are in order that we can act accordingly. Since City Hall is closed on July 3rd, 4th and 5th, in the event that we don't hear from you we will assume that you will begin working full time on Monday July 6, 1998.
>
> If there is anything that may preclude you from working full time please advise me in writing immediately. If this is due to a medical condition we will need written verification from your doctor explaining the nature of the condition and its impact upon your ability to work full time. If their [sic] are any reasonable accommodations that the city can make that will enable you to perform your job on a full time basis please immediately schedule an appointment with me to discuss these accommodations.

In the event you are unable to perform your job on a full time basis please immediately schedule an appointment with me to discuss these accommodations.

In the event you are unable to perform your job on a full time basis, with or without reasonable accommodations, the city will have to terminate your employment in order to obtain a full time person.

Please also be advised that you may have additional rights under the personnel policy handbook. I suggest you review these policies prior to making your decision to see if you have any additional options.

On June 29, 1998, Plaintiff delivered a second note to the city from Dr. Rosa Abraira stating that "Susan is still not able to work on a full time basis -- she needs still a period of treatment before full time employment."

On Monday, July 6, 1998, Plaintiff learned that there was a problem with the mainframe computer. Plaintiff was aware that the problem could impact the processing of payroll for all city employees, which needed to be done that day as well as payments for vendors. She placed a service call and left a message for a return call from a service technician. Plaintiff did not inform Zank of this problem but spoke with Janet O'Leary of the payroll department. At approximately 12:00 p.m., plaintiff placed a second telephone call for service and once again left a message for a return call. Plaintiff indicated in her message that this was an emergency situation and that they needed assistance in order to get the city's payroll processed. After placing the two calls, plaintiff informed O'Leary that she had done all that she could do and she left for the day.

Upon returning from lunch, Zank called plaintiff at her home and asked her to return to City Hall to solve the pending problem if possible and to have a face-to-face discussion. Plaintiff met with Zank in his office and he asked plaintiff whether she knew that the mainframe computer was not in operation. Plaintiff responded that she did and stated that she had placed

two service calls. Zank asked plaintiff if she intended to stay at work until 5:00 p.m. and she stated that she would not because she was "under doctor's orders" and "had not been released yet to work full time." Zank asked plaintiff whether there were any accommodations that could be made to enable her to work full time and plaintiff responded that until she was released by her doctor she would be following her doctor's orders. Zank then informed plaintiff that her employment would be terminated effective immediately. On July 8, 1998, Zank provided plaintiff with a letter regarding the termination of her employment. Specifically, the letter stated:

> The purpose of this letter is to serve as formal notice that your employment with the City of Berwyn was terminated at the meeting that took place on Monday July 6, 1998 at 2: 00 P.M. You had gone home for the day at lunch time, and I telephoned you and asked you to come in and see me. I pointed out to you that we were in a crisis situation in that two of our data bases were down and one of them was payroll. The conversation that occurred during the meeting was:

> (1) I asked you if you could stay and fix the problem that had occurred that morning, also if you would start to work full time as your job description states and as required by your job. You responded NO that your doctor would not allow you to start working full time.

> (2) I asked you if there were any accommodations that I could make that would allow you to work full time? You responded NO.

> (3) I asked you if there was anything you wanted to say about your job whatsoever? You responded NO.

> (4) I then stated that you would not help us in our crisis and work full time, I was dismissing you and terminating your employment with the city, effective immediately.

> Since our meeting took place, I have been in constant communication with Systems Consultants Inc., our software vendor and Unisys, our hardware vendor, t[r]ying to fix the problem that has occurred in our computer system. It is now Wednesday morning and most of the problems have been resolved, however, we passed the deadline for A.C.H. automatic transfer of payroll funds. For that reason I had to send out a memo to all 115 employees (see attached memo) who use A.C.H. and tell them that the deposit of their checks will most likely be one day late. I would

ike to point out that during my 17-years as comptroller overseeing the payroll department this is the FIRST time that a payroll is going out late.

Zank testified that he did not know what else plaintiff could have done to resolve the computer problem. He did not do anything else that day to address the computer problem. Plaintiff has not been employed or sought employment since Zank terminated her employment with Berwyn.

II. Discussion

A. Sexual Harrassment under Title VII and Equal Protection Clause of the 14th Amendment

To establish a prima facie case of a hostile work environment, plaintiff must establish that "1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; 2) the harassment was based on sex; 3) the sexual harassment had the effect of unreasonably interfering with the Plaintiff's work performance by creating an intimidating, hostile or offensive work environment that affected seriously the psychological well being of the Plaintiff; and, 4) there is a basis for employer liability." *Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir. 1993).

Defendants argue that the workplace conduct of which plaintiff complains was not sufficiently pervasive or severe to alter the conditions of her employment "by creating an intimidating, hostile or offensive work environment that affected seriously [her[] psychological well being." *Id.* As to plaintiff's allegations that Zank viewed "pornographic images" on his computer, defendants allege that plaintiff stated that in the last six months of her employment, the conduct was infrequent. Plaintiff also does not know if Zank or someone else at work sent her the suggetive e-mails. They state that her sexual harassment claims under Title VII and the Equal Protection Clause must therefore fail.

-11-

Plaintiff does not dispute the standard defendants assert must be used to measure their conduct but states that the record indicates that Zank created a pervasive and hostile work environment that was sexually harassing. Plaintiff filed this case on July 7, 1999, so allegations concerning her Equal Protection claim can date back to July 1997. Although her Title VII claim is limited to incidents occurring after November 11, 1997, her Equal Protection claim is not. Nor have defendants cited a case that indicates how frequently a supervisor introducing pornography into the workplace must do so before a hostile environment exists. The more egregious the behavior, the less frequently it needs to occur before a violation is found. "Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (citations omitted). Displaying pornographic pictures to an employee "[is] indeed [some]thing that an employer should tell its supervisors not to do." *Minor v. Ivy Tech State College*, 174 F.3d 855, 858 (7th Cir. 1999). Plaintiff's testimony that the Zank engaged in viewing pornography in full view of employees on a regular basis

The court also finds unconvincing defendants' argument (without citation) that because Zank's computer monitor was 12.5 feet away from the hallway, it somehow does not contribute to a hostile environment. The detail with which plaintiff described the images, as well as the fact that other employees testified that they could see the pictures when passing Zank's office indicates that the computer screen was in full view of other office employees. As to the argument that plaintiff's receipt of a Victoria's Secret catalog in the mail at work "belie(s) her claim that the alleged conduct

was offensive to her," the court finds that the comparison of a catalog from this store (which, as plaintiff points out, is a national retail chain that advertises on prime time television) with the photographs plaintiff described in her deposition is nothing short of bizarre. Although a defendant is entitled to argue that a plaintiff welcomed the behavior about which she complains, there is nothing in the record to establish that plaintiff showed the catalog to Zank or anyone else at work or did more than lend the catalog to someone who requested it. The additional claim that plaintiff welcomed any action because "she had to look through a window from another office to see a computer monitor on a credenza twelve feet away" is meritless. Defendants can hardly expect the court to seriously consider a defense to a sexual harassment claim that would create an obligation for employees to actively ignore offensive behavior occurring in front of them. Such a requirement would vitiate Title VII's aims and protections.

The court finds that questions of fact exist as to the frequency and duration of Zank's conduct and whether it created a hostile work environment in violation of Title VII and the Equal Protection Clause, as well as to when Shaugnessy learned of Zank's behavior and whether he failed to take appropriate action after being informed of it. For these reasons, the court denies the motions for summary judgment as to Counts I and VI.

B. Americans with Disabilities Act

Plaintiff claims that the defendants failed to reasonably accommodate her disability when Zank refused to allow her to continue a part-time schedule. Defendants make several arguments in support of their motion for summary judgment on this claim; the court will address only one.

To qualify for protection under the Act, plaintiff must have a physical or mental condition that substantially limits a major life activity. 42 U.S.C. § 12102(2)(A)-(C). Defendants point to

plaintiff's own description of her anxiety disorder and its causes to refute her contention that her condition is a disability covered under the Act. She stated that her symptoms of stress appeared following interactions with Zank and that her complaints to her doctors related to stress and anxiety at work. Even plaintiff states in her response to the motion for summary judgment that she "suffered a disability that was caused by Defendants' conduct." The record establishes that plaintiff's anxiety and stress were attached to her specific job and supervisors and that her condition was therefore not a disability protected under the ADA. *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1061 (7th Cir. 2000); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir.1996) (plaintiff's alleged disability of stress and anxiety were caused by her supervisor and therefore not recognized as a disability under the ADA because her major life activity of working was not substantially limited). For this reason, the court grants defendants' motion for summary judgment as to Count II.

## C. First Amendment Activity

Plaintiff claims that defendants violated her First Amendment rights by retaliating against her after she spoke out against Zank's use of public time to view pornography and his use of public funds and equipment to print out and store his pornographic pictures.

The First Amendment does not protect an employee when the speech at issue concerns a personal grievance instead of a matter of general public concern. *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987). While the topic of sexual harassment is certainly one of public concern, the Seventh Circuit had indicated that the court should look to the point of the employee's comments when determining whether a particular employee grievance qualifies for First Amendment protection. The form of plaintiff's complaint as well as the fact that is was made in

a one-on-one conversation with a supervisor in a private setting involving a personnel complaint indicates that plaintiff's motivation was personal. *See Zoch v. City of Chicago*, 1997 WL 89231 (N.D.Ill.). The court finds that plaintiff has failed to establish that she exercised her First Amendment rights when complaining of Zank's conduct to Shaugnessy. It therefore grants defendants' motion for summary judgment as to Count IV.

D. Retaliation for Protected Activity Under Title VII

Defendants claim that plaintiff cannot establish the "causal link" between her protected activity and the adverse job actions she faced that is necessary before a claim of retaliation can be proved. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 393 (7th Cir. 1998). To establish a claim for retaliation for protected activity under Title VII, plaintiff must establish that 1) she engaged in statutorily protected activity; 2) she suffered an adverse employment action; and 3) there is a causal link between the protected activity and the adverse action. *Id.*

Both plaintiff and defendants address mainly the retaliation claim in light of plaintiff's alleged First Amendment activity. As the court has found that plaintiff has not established that she exercised her First Amendment rights, that portion of the retaliation claim necessarily fails. As to plaintiff's claim that defendants retaliated against her for protected Title VII activity, defendants state only that plaintiff 1) did not engage in protected activity and 2) her termination was the only adverse action she faced and that action was the result of "her own unwillingness to assist in the resolution of a computer problem and her unwillingness or inability to return to full time employment status."

In response, plaintiff maintains that the day after Zank's meeting with Shaugnessy concerning his improper use of the Internet, Zank informed plaintiff that she could no longer work on a flex-

-15-

time schedule and must return to a 9 to 5 schedule. Although an employer certainly has the right to set a schedule for employees and to require them to be in the office during those hours, the record here establishes questions of fact concerning whether flex-time schedules were generally permitted in city hall and whether Zank's proffered reason for withdrawing approval for plaintiff's flex-time schedule was pretextual, coming as it did on the heels of his learning of the complaint about his Internet use and without any apparent change in circumstances that would necessitate plaintiff working a 9 to 5 schedule.[2] Although defendants claim that a change in schedule is not an adverse action, it appears that Zank was aware that plaintiff would be unable to continue working if a 9 to 5 schedule were required. A significant change to an employee's schedule may constitute an adverse action. *See Rizzo v. Sheahan*, 2000 WL 679982, *13 (N.D.Ill.); *Bevukacqya v. Cubby Bear, Ltd.*, 2000 WL 152135, *7 (N.D.Ill.).

According to defendants, the conflict over the requirement that plaintiff work a 9 to 5 schedule also contributed to her termination. They argue that they had a legitimate and nondiscriminatory basis for the decision, which was the result of plaintiff's "own unwillingness to assist in the resolution of a computer problem and her unwillingness or inability to return to full time employment status." The court has already held that plaintiff established a question of fact as to whether the requirement that she work 9 to 5 hours was based on a legitimate, nondiscriminatory reason or whether it was pretextual. Questions of fact also exist as to whether plaintiff was "unwilling" to assist with the computer problem when she made several service calls in an attempt to fix the problem and Zank could not specify anything else she could have done to resolve the

---

[2] Although defendants state repeatedly in their brief that plaintiff was paid for full-time work while working part-time hours, the record indicates that plaintiff either worked at home or used accumulated sick leave or vacation time for the days she was not in the office.

problem. For these reasons, the court denies the motion for summary judgment as to Count III.

E. Intentional Infliction of Emotional Distress

As to Count V, plaintiff's state law tort claim of intentional infliction of emotional distress, defendants argue that Zank's conduct was not so extreme or outrageous as to constitute a cause of action. They cite no case to support this contention. Plaintiff responds only that defendants' failure to cite a single applicable case means that summary judgment is inappropriate. Although the court would generally agree, it must consider the Illinois Supreme Court's decision in *Maksimovic v. Tsogalis*, which held that the Illinois Human Rights Act bars common law tort claims inextricably linked to civil rights violations. 177 Ill.2d 511, 687 N.E.2d 21, 227 Ill.Dec. 98 (1997). The court stated in *Maksimovic,* however, that whether jurisdiction exists over a tort claim depends on whether "the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." 177 Ill.2d at 517. A plaintiff can maintain a tort claim "[t]o the extent that the plaintiff has alleged the elements [of the tort] without reference to the legal duties created by the [IHRA]." *Id.*

The court grants the motion for summary judgment as to Shaugnessy and Zank because plaintiff cannot "establish the necessary elements of the tort independent of any legal duties created by the Illinois Human Rights Act [IHRA]." The theory of the tort claim against both defendants is sounded in sexual harassment and retaliation for protected activity under the IHRA. It is therefore preempted.

**ORDERED**:  For the foregoing reasons, the court grants the motions for summary judgment as to Counts II, IV and V; and denies the motions for summary judgment as to Counts I and III.

**ENTER**:

_[signature]_

_____

George W. Lindberg
United States District Judge

JUN 2 9 2000

DATED: _____